## Continental Bank & Trust Company of New York et al. *v.* American Assembling Machine Company, Inc.

Argued April 12, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

rear-gument refused September 25, 1944.

*Edward J. Fox, Jr.,* of *Fox & Barber,* with him *John Field Oldt,* for receiver, appellant No. 124, appellee Nos. 136 and 159.

*Calvin F. Smith,* for creditor, appellant No. 136, appellee No. 124.

*M. J. Riskin,* of *Taylor, Taylor & Riskin,* for creditor, appellant No. 159.

*Charles P. Maxwell,* with him *Frank Reeder, Jr.,* for creditors, appellee No. 136.

OPINION BY MR. JUSTICE HUGHES, June 30, 1944:

On October 8, 1931, a bill in equity was filed by The Continental Bank & Trust Company of New York, The Bank of Sicily Trust Company of New York, and The Hibernia Trust Company of New York, as creditors of the American Assembling Machine Company, seeking the appointment of a receiver. This resulted in the appointment of Chester Snyder as receiver. The order of appointment authorized the receiver to take possession of the business of the American Assembling Machine Company and to manage and conduct the same, in such manner as will, in his judgment, produce most satisfactory results, so that the operation of the business shall be continued in the same manner, including the extension of the usual credits to purchasers of merchandise and machinery, the preservation and protection of the business and properties, and "to protect the title and possession, and secure and develop the business." The order further authorized the receiver "to purchase materials and labor and to complete and fill the contracts entered into by said Corporation, and which now remain unfilled." The same order authorized the receiver "to issue and deliver his certificates as receiver up to the amount of Seventy-Five Thousand Dollars, ($75,000), to provide the necessary capital with

which to conduct said business and complete said contracts." At the time this order was made the American Assembling Machine Company occupied a building erected by the Mechanical Realty Company, against which building a mortgage in the amount of $155,000.00 had been placed to secure a bond issue. The machinery and equipment of the American Assembling Machine Company had been moved into this building, as trade fixtures, for the manufacture by it of machinery. Under the order appointing the receiver, the appraisers appointed appraised the machinery, fixtures and equipment of the American Assembling Machine Company at $37,960.00. On December 12, 1932, the receiver presented a petition to the court, reporting his conduct of the business; that he had issued receiver's certificates in the amount of $50,000.00; that he had an offer from the T. W. and C. B. Sheridan Company to purchase the plant owned by the Mechanical Realty Company for $100,000.00, and that it was to the best interests of the creditors and stockholders of the American Assembling Machine Company that the sale should be made. After due notice, on December 27, 1932, the court authorized the sale. On the same day the court authorized the sale to the Sheridan Company of the patents and good will, except the patent rights for the machine known as the Stuffing Machine, for 5% commission on all sales of new Gatherers, Stitchers, Coverers, Binders, Rowe Trimmers and Donnelly Wrapping Machines, for a period of ten years from January 1, 1933, until total commissions reached $100,000.00; no further commissions to be paid after December 31, 1942. The Sheridan Company was to purchase, "for the sum of $100,000.00, . . . the property of the American Assembling Machine Company now on the premises . . . occupied by the said American Assembling Machine Company and owned by the Mechanical Realty Company, Inc., . . . free and clear of all liens and encumbrances, . . ." The receiver consummated the sale, but instead of re-

taining $100,000.00 for the receivership, applied the whole of it to the bonds under the mortgage, of which transaction all of the creditors had notice. To this procedure exceptions were filed, which the auditing judge and chancellor overruled, holding that the trade fixtures of the American Assembling Machine Company, as tenant of the Mechanical Realty Company, became subject to the lien of the mortgage on the property of the Mechanical Realty Company, and that title to the trade fixtures passed to the purchaser upon the foreclosure of the mortgage.

The record discloses that the Board of Trade of Easton was seeking to bring industries to that community in 1927, and the Mechanical Realty Company was formed as a wholly-owned subsidiary of the American Assembling Machine Company to erect a building to house the American Assembling Machine Company. The five banks in Easton participated in placing the $155,000.00 mortgage on the building, which mortgage was known as the "Board of Trade Mortgage." [1] Among the guarantors of the mortgage was the American Assembling Machine Company. After the erection of the

---

[1] In the mortgage appeared such clauses as, "Together with . . . the appurtenances and all improvements thereon." "To have and to hold the said property and premises, with the appurtenances unto the said party of the second part, . . ." "But in trust nevertheless, under and subject to the provisions and conditions hereinafter set forth. . . ." "Article III. The Mechanical Realty Company agrees at all times to keep the buildings, equipment and fixtures and all the tangible destructible property covered by this indenture insured . . ." "Article VI. Upon any and every default in the payment of any interest on the said bonds . . . the trustee . . . , shall by such agent . . . enter upon and take possession of all and singular the franchises and properties of the said Mechanical Realty Company . . . , and have, hold, use, occupy . . . , manage and operate the same, in the business of the said Mechanical Realty Company, exercising the franchise pertaining thereto, and collecting and receiving all proceeds, income, rents, issues and profits of the same, . . ."

building the machinery and equipment of the American Assembling Machine Company, appraised at $37,960.00, were moved in and this plant was operated as a manufacturing and assembling plant up until the receivership, and thereafter it continued to be so operated under the order of the court. An operating plant was in contemplation when the mortgage was given. Under the relations that existed when the American Assembling Machine Company moved in, it, as owner of the Mechanical Realty Company, knew the terms of the mortgage. "This is a case where [all] parties to the transaction had in mind a completed manufacturing plant to be subject to the lien of the mortgage, not one where they were putting a lien on bare walls but upon machinery and appliances necessary to the functioning of a completed plant": *Commonwealth Trust Company of Pittsburgh v. Harkins et al.,* 312 Pa. 402, 409, 167 A. 278. If, when the mortgage was given, the parties contemplated it should cover an operating plant, the fact that machinery was placed in the plant after the mortgage was given, is relevant in determining the extent of the lien of the mortgage. If the machinery and appliances are necessary to the functioning of a complete plant, they are fixtures and bound by the lien of the mortgage: *Commonwealth Trust Company of Pittsburgh v. Harkins et al.,* supra; *Central Lithograph Company v. Eatmor Chocolate Company (No. 1),* 316 Pa. 300, 175 A. 697; *McClure v. Atlantic Rock Company, Inc.,* 339 Pa. 296, 300, 14 A. 2d 124; and the fact that the machinery and equipment were brought on the premises by the lessee, who was fully acquainted with the whole mortgage arrangement, does not change the situation: *McClure v. Atlantic Rock Company, Inc.,* supra.

In 1931, an investigation disclosed that the American Assembling Machine Company had borrowed heavily from banks and finance companies. A meeting of these creditors was called to determine what course should

be followed and they agreed on an operating receivership to work out their difficulties. Chester Snyder, the then president of the First National Bank and Trust Company of Easton, was chosen as such receiver. "The authority of a receiver, as an executive in control, is subject to the court alone; he exercises the functions of the board of directors, managers and officers, takes possession of corporate income, property and assets, directs not only its operation, but, while in control, its policies on all lines. It is his duty to preserve the property from untimely sale, and his obligation in this respect differs from that of a sheriff or other officer commanded to execute a writ in a given time. He has power to delay action until a more advantageous time is present, when it may not be necessary": *McDougall et al. v. Huntingdon and Broad Top Mountain Railroad and Coal Company,* 294 Pa. 108, 116, 143 A. 574; *Fried et al. v. Fabiani et al.,* 120 Pa. Superior Ct. 558, 182 A. 717. Under the broad powers granted to this receiver which have already been outlined, he took charge of the American Assembling Machine Company and attempted to carry out those duties which the creditors, now the exceptants, had petitioned the court to grant him. He was to attempt the rehabilitation of an insolvent concern, operating at a loss, in a period of national depression. At the time he was appointed receiver he was seventy-two years of age and was entering on an enterprise in which those who had been experts in the field had been unable to succeed. When he assumed the receivership there were outstanding, "machines delivered but not completed and on the floor of the purchaser." These machines were in the hands of the outstanding customers in the trade, and if the reputation of the company was to be preserved and it was to remain in this field and compete for future business from these customers, it became necessary for the receiver to perfect them. This was also required if the customers were to pay the balances due on their contracts. The record

shows that the size and type of these machines prevented their being finished in the factory; they were required to work with precision and were sold subject to erection on the floor of the customer, with satisfactory operation guaranteed. Such expense had been an incident of the business prior to the receivership, and an examination of the record shows that the receiver spent a similar amount in the same corresponding period of time after the receivership occurred. After the mandate given to the receiver, through the exceptants' original petition and the order of court thereon, they cannot, having shown no breach of duty on this account, now complain that his efforts in this line were a failure, and the court granting such powers should not have surcharged the receiver for this item. The amount of this surcharge was $47,922.44.

When the assets of the American Assembling Machine Company were sold to the Sheridan Company, "the patent rights for the machine known as the stuffing machine" were not included. The machines under the patents were known as inserting and mailing machines. At the time the receiver was appointed there were eleven of these machines in the process of manufacture, and on the floor were eleven such machines which were the property of the Inserting and Mailing Machine Company. The eleven finished machines were levied upon and sold by the sheriff on a judgment of the American Assembling Machine Company against the Inserting and Mailing Machine Company and purchased by the attorneys for Snyder, the Receiver, for one dollar. These machines were taken by Snyder to a property of his own and some were there destroyed by fire. He also took the eleven incomplete machines to the same place and personally engaged in the business of manufacturing these machines. While so operating, he sold four of the incomplete machines for $3,000.00, and one for $1,500.00. The remaining six he sold to two of his employees for $25.00 each, who completed them

and sold them at $2,350.00 each. The receiver only accounted for the $150.00 he received from his employees. The learned auditing judge said: "Under the circumstances, we have no other alternative than to surcharge the Receiver for the amount which he himself stated could in his opinion be realized from the sale of both groups of machines, viz.: $15,000.00." "The rule of equity which prohibits a trustee for sale from purchasing the trust property, is not founded on his being necessarily guilty of fraud in so doing. It is a rule of public policy which applies in all cases, whether there be fraud or not, and indeed its great object is to prevent fraud by taking away the temptation to commit it. Another reason for the rule is the difficulty, if not impossibility in many instances, of ascertaining whether there was fraud or not": *Webb v. Dietrich*, 7 W. & S. 401, 402. "Where property has been sold for less than its appraised value and purchased by the receiver without the consent of the court, he may be surcharged with the difference between the price received and the appraised value": *Bloch Bros. v. Sol Heller's Sons, Inc.*, 104 Pa. Superior Ct. 483, 488, 159 A. 203; *French v. Pittsburgh Vehicle & Harness Company*, 184 Pa. 161, 39 A. 63, 53 C. J. 374. We therefore sustain this surcharge in the sum of $15,000.00.

The receiver spent $1,941.34 to promote sales for the Inserting and Mailing Machine Company. He attempts to justify this because that company was indebted to the American Assembling Machine Company in the sum of $40,000.00 and a sale of their machines might reduce their indebtedness. Under no stretch of the broad authority granted him to operate the company could it be construed to authorize the receiver to spend money to promote sales for the Inserting and Mailing Machine Company. A receiver has only such powers and authorities as are given him by the court and must not exceed the prescribed limits. The promotion of the sales of another corporation was clearly beyond the

powers granted the receiver and this item of surcharge must stand.

On December 27, 1932, the court approved the sale of the land and building of the Mechanical Realty Company to the Sheridan Company. In January, 1933, a controversy arose over the machines on the premises claimed by H. Russ VanVleck and valued at $12,000.00. The Mechanical Realty Company and the mortgagee had notice of the conditional sales agreement of the sale of this machinery to the Inserting and Mailing Machine Company. When the mortgage was foreclosed, VanVleck machines remaining on the property under the conditional sales contract were owned by VanVleck until fully paid for. VanVleck demanded the balance due. The controversy was settled by the receiver compromising the lien on the property of the Inserting and Mailing Machine Company for $3,000.00, all of which worked no benefit to the creditors of the American Assembling Machine Company. The appellants claim it prevented the sale of the property to Sheridan from being rescinded; but, as we read the record, that sale had already been consummated. The learned auditing judge has so found the facts, and such findings affirmed by the court below will not be disturbed on appeal unless it is clearly shown they are erroneous: *Covington v. Hawes-LaAnna Company*, 245 Pa. 73, 75, 91 A. 514.

A Cahen Forwarding and Casing-in machine was returned by Little & Ives Company to the receiver. This machine had a contract sale price of $18,000.00 but was returned as being defective. After its return, the machine was destroyed by fire. The receiver had neglected to liquidate this account for more than six years, and thereafter it became impossible to realize anything upon the asset. The court below determined the receiver guilty of negligence in the handling of this matter, found the fair market value of the machine to be $1,500.00, and accordingly surcharged the receiver. He was correct in so doing.

Prior to receivership the American Assembling Machine Company had assigned to the Mercantile Contract Purchase Corporation the account receivable of Smythe-Horne, Ltd., in the amount of $57,233.57 as collateral to secure loans. On December 7, 1931, at the request of the Mercantile Contract Purchase Corporation, the receiver petitioned the court to be empowered to collect this account receivable and transmit the fund in toto to the Mercantile Contract Purchase Corporation. The receiver collected $17,152.10, paid over $10,083.28, and retained $7,068.82 which he applied to erection costs. The Mercantile Contract Purchase Corporation seeks to surcharge the receiver for this item. The testimony reveals that the Mercantile Contract Purchase Corporation consented to the expenditure of money on this and other machines which were the subject of the assigned account. They are not now in position to object to the receiver retaining $7,068.82 for the purpose of reimbursing the receivership estate for moneys expended out of funds of the receivership that inured directly to their benefit. This exception is without merit.

The court refused to allow the receiver a commission, stating: "We have definitely found that he was negligent in the management of the trust estate, has wasted its assets, and has been interested in the purchase of personal property belonging to the receivership estate without disclosing that fact to the Court. Under these circumstances he is not entitled to commissions and must be surcharged therefor: *Pangburn v. American Vault, Safe & Lock Co. (No. 2)*, 205 Pa. 93; *Covington v. Hawes-LaAnna*, 245 Pa. 73." After examining the record, we adopt the conclusion of the court below.

We have considered all of the assignments, and all those not specifically dealt with are deemed to be without merit.

The record is remitted to the court below for further proceedings in accordance with this opinion. Costs of these appeals to be shared equally by each of the appellants.